## CUSHWAY v. STORK ENGINEERING CO., Inc.

### Civil Action No. 199.

District Court, E. D. Michigan, N. D.

Aug. 20, 1943.

Arthur J. Kinnane, of Bay City, Mich., for plaintiff.

E. B. Reese, of Saginaw, Mich., for defendant.

TUTTLE, District Judge.

Plaintiff, a resident of the City of Saginaw, Michigan, sues defendant, a Michigan corporation, for unpaid minimum wages and overtime compensation in the sum of $2,429.75, as well as a like amount for liquidated damages and a reasonable attorney fee and costs of suit, under the Fair Labor Standards Act of 1938, §§ 1–19, 29 U.S.C.A., §§ 201–219.

Plaintiff alleged that he was employed by the defendant "as night watchman and working employee at its place of business in the City of Saginaw, Michigan, and, throughout said period, plaintiff was personally engaged * * * in an occupation and processes necessary to the production of goods which were destined for and shipped in interstate commerce" and further alleged that he "was engaged in an occupation and processes necessary to the production and repair of machine tools and machine parts which were delivered to various persons, corporations and manufacturing concerns within the State of Michigan, for use by said persons, corporations and manufacturing concerns in the production of goods which were destined for and shipped in interstate commerce, said services consisting of watching over the safety and preservation of the products in the course of manufacture, the stock of goods and materials kept and located in and about the factory building of the defendant, the machinery, equipment and building used in such manufacture, maintaining proper temperatures in the gas furnaces and coal fired heating plant used for heating castings in the foundry and heating the buildings, preventing damage by freezing to the wet sand forms in the foundry, which forms were used in the manufacture of said goods for interstate commerce, maintaining proper temperatures in the heating of castings for tempering purposes, making the place of business, foundry and factory ready for the use of the day working crew by cleaning all machines and floors, cleaning furnace grates and removing ashes and debris, all of which services went directly into the production of the aforesaid goods and products destined for and shipped in interstate commerce"; and that his employment under the Act continued from the 24th day of October, 1938 (the effective date of the Act), to and including November 27, 1941. The evidence is undisputed that he worked thirteen (13) hours a night, from 5:30 P.M. until 6:30 A.M. seven nights per week and that his wages were $37.50 bi-monthly, or $75 per calendar month, his wage scale thus being $0.1896 per hour.

During such time defendant was engaged in the manufacture of machine tools, dies, jigs and special machinery, the bulk of which were sold and delivered to General Motors Corporation and subsidiaries thereof within the State of Michigan, but a portion of which products were sold and delivered to persons and concerns located outside the State of Michigan. The evidence shows and the Court finds that the business of the defendant during the period in question, on the basis of invoice amounts and dates of delivery or shipments, was apportioned as between interstate and intrastate deliveries as follows:

deemed to have been engaged in the production of goods if such employee was employed * * * in any process or occupation necessary to the production thereof, in any State."

It is also the claim of the defendant that certain shipments of goods produced in the year 1939 by the defendant at its place of business and delivered to points outside the State of Michigan on order of the AC Spark Plug Division of General Motors Corporation located at Flint, Michigan, should be excluded, and if so excluded from the computation of out of state sales, would reduce the out of state deliveries

|  | Sales | In-State | Out-State | Per Cent |
|---|---|---|---|---|
| 10–24–38 to 10–31–39 | $122,590.30 | $112,792.56 | $ 9,797.74 | 7.99% |
| 11– 1–39 to 10–31–40 | 230,772.99 | 125,327.55 | 105,445.44 | 45.69% |
| 11– 1–40 to 11–27–41 | 325,438.64 | 293,901.90 | 31,536.74 | 9.6% |
| Total | $678,801.93 | $532,022.01 | $146,779.92 | 21.62% |

Defendant contends that the foregoing tabulation of the nature and distribution of the defendant's business is unduly favorable to the plaintiff in that a further break-down of the invoice dates and amounts demonstrates that during the calendar year 1939, i. e. from January 1, 1939, to December 31, 1939, inclusive, the percentage which the out of state deliveries bore to the total business was 2.78%, and it is the contention of the defendant that the amount of interstate business of the defendant during that period is not substantial and that the Court should apply the doctrine de minimis non curat lex and deny the plaintiff compensation under the Act for that period of time. According to the figures presented by the defendants and concurred in by the plaintiff, the defendant during the calendar year 1939 sold and delivered goods in the value of $120,225.72, of which goods in the value of $3,344.26 were delivered to points outside the State of Michigan, the percentage of such deliveries being 2.78%.

The defendant also contends that the plaintiff is not entitled to the benefits of the Act during the summer months when it was unnecessary for him to maintain a fire in the boiler which supplied heat to the premises, and urges upon the Court that the work of a watchman who merely sweeps the floor and guards the premises is not work falling within the meaning of Section 3(j) of the Act, which provides: "And for the purposes of this Act an employee shall be

in the year 1939 to $1,794.40, representing a percentage of 1.29% of the total business for that year, and that two shipments in October of 1940 to points in Ontario, Canada, on order from the AC Spark Plug Division, totaling $6,000, should also be eliminated from the computation of the amount of goods produced for commerce in that year. Defendant's contention in regard to these deliveries is that the goods were in effect delivered to a Michigan concern, but the defendant's records show that the order in each case specified out of state delivery and shipment was made by the defendant in each case directly out of state.

The evidence is undisputed that in all but eighteen (18) weeks of the period in question, there was some activity in commerce in the defendant's factory, either in the form of labor going on in relation to a product intended for out of state delivery, or in the form of purchases, receipt and storage of materials intended to be used in the production of goods to be shipped out of the state, or the actual shipment of such products. The plaintiff claims that during the eighteen (18) weeks in which the evidence fails to show labor going on, or in-shipments or out-shipments of materials intended for commerce, that the services rendered by him as night watchman in watching over and guarding the stock of materials, machinery and factory of the defendant, as well as the labor performed by him in sweeping and the maintaining of fires.

for general heat, related equally to the interstate as well as the intrastate business of the defendant. No records were kept by the defendant as to what portions of the time or services of the plaintiff related to either phase of its business. It is undisputed that the defendant at all times maintained a stock of materials and supplies sufficient for its needs for at least a sixty (60) day advance period, and that the defendant had throughout the period and for some years prior thereto, produced and maintained within its factory a stock of pump jack units and machine parts which it sold on demand to regular customers located outside the state, although neither the quantity nor value of such materials and parts appeared, the defendant having kept no running inventory thereof. It also appeared by the testimony of the president of the defendant company that his company maintained such stocks and supplies, as well as stocks of other materials, for the purpose of serving the needs of out of state customers who might order them, and that the out of state business of the defendant generally was fairly regular and well established, although constituting the minor portion of the defendant's business.

Prior to commencement of trial, on proceeding for discovery instituted by the plaintiff, the Court, by written order in that proceeding, excluded from the issues involved in this case the claim of the plaintiff that machine tools were produced by the defendant and sold and delivered to manufacturing concerns within the State of Michigan for use by such concerns for the production of goods for commerce and that defendant thereby was engaged in commerce. During the trial plaintiff renewed his offer to produce such evidence and was given the benefit of an exception to the denial thereof by the Court.

■ The Court finds the evidence sufficiently clear and comprehensive to support the material allegations and claims of the plaintiff, and makes the following findings of fact and law:

(1) The claim of defendant that the production and shipment of goods to points outside of the State of Michigan on order of the AC Spark Plug Division of General Motors Corporation did not constitute the production of goods for commerce, seems to be disposed of by the definition of "commerce" as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof." Title 29, U.S.C.A. § 203(b). The Court finds that the shipments on the order of A.C. Spark Plug Division to points outside of the State of Michigan, and to points in Ontario, Canada, constituted shipments in interstate commerce and are properly considered in the computation of the amount of interstate commerce production of the defendant.

■ (2) The services rendered by the plaintiff in merely watching and guarding the stock of raw materials, goods partly processed and in course of production, and the plant and premises of the defendant were necessary to the production of goods for commerce by the defendant within the meaning of the Act. That he rendered some service in the form of actual labor by sweeping the floor and cleaning around the various machines, and during the winter months maintained heat in the boiler used for heating the premises, merely adds to the value of his services but does not control his status as an employee necessary to the production of goods for commerce.

■ (3) The defendant was throughout the period in question engaged in interstate commerce within the meaning of the Act. The amount of interstate business done by the defendant was substantial, even though constituting at times the minor portion of the defendant's business. The break-down of the defendant's business in the form presented by the defendant does not change the substantial character of the out of state business of the defendant, but results in grouping the dollar value of deliveries at certain periods so that in the period from October 24, 1938, to the end of the year 1938, the percentage of out of state deliveries by the defendant amounted to something like 79% of the total business as compared to 7.99% for the period from October 24, 1938, to October 31, 1939, and the percentage of out of state business done by the defendant for the calendar year 1939 is reduced to 2.78%. According to defendant's figures, the percentage of out of state deliveries to total deliveries in dollar value for the year 1940 becomes 48.53%, whereas, the percentage of out of state to total deliveries for the month of January, in the year 1940, is 74.10%, and for the first quarter of the year 1940 amounts to 54.33%. Other evidence produced by the plaintiff and not disputed by the defendant

indicates that during the year 1939, with the exception of a few weeks, work was actually going forward on goods intended for shipment out of the State of Michigan, some of which was apparently represented by the high percentages of out of state deliveries in the first part of the year 1940. The character of the business of the defendant cannot be fairly determined by a consideration of the dates and amounts of deliveries alone, but there also enters into consideration the times when labor or other activity necessary to the production of goods for commerce was actually in progress. The Fair Labor Standards Act, in the opinion of this Court, is essentially designed to lessen hours of labor through the means of minimum wages and also to establish a minimum wage, and is concerned with the weekly hours of labor rather than with the dollar value of products. The Court does not regard percentages as controlling of the question of substantiality, and finds that the defendant was substantially engaged in commerce throughout the period in question and that the plaintiff watchman was, therefore, necessarily engaged in commerce, although his services likewise related to the intrastate business of the defendant. The services rendered by the plaintiff during the eighteen (18) weeks of non-interstate activity in the defendant's plant nevertheless were beneficial to the interstate business of the defendant. One of those weeks occurred in December of 1938, two in January of 1939, one in the latter part of January and first four days of February, 1939, four consecutively from February 12 to March 11, 1939, one in May, 1939, one in August, 1939, one in October, 1939, one in January, 1941, two consecutively in August, 1941, the first week of September, 1941, and two consecutively in September and October of 1941. It is impossible to segregate these weeks of labor from the interstate business of the defendant, inasmuch as to do so would be to say that the services of the plaintiff during those weeks were not essential or beneficial to the defendant's interstate business. If the entire plant of the defendant remained idle during those weeks, but the plant, machines and stock were used for the production of goods for commerce in subsequent weeks, it would be clear that the services of the plaintiff during those idle weeks were essential and necessary.

(4) The plaintiff worked seven nights per week, thirteen hours per night, and throughout his hours of work was not allowed to leave the premises. He missed one day's work in September of 1939 and another day in September of 1940, but it does not appear that his wages were reduced on that account. During the first year from the effective date of the Act, a period of 365 days, or 52 complete work weeks and one (1) day, the plaintiff should have been paid at the rate of 25¢ per hour for the first 44 hours of each work week, and at the rate of 37½¢ per hour for 47 hours of overtime in each week, a total of $1,488.24, allowance being made for the day he did not work as off-setting the 365th day of the year. During the second year from the effective date of the Act, a period of 366 days because of leap year, the plaintiff should have received 30¢ per hour for the first 42 hours of each work week and 45¢ per hour for 49 hours of overtime in each work week, a total of $1,801.80 for the 52 complete weeks, plus $9.90 for the two extra days in the year, less $5.85 for one day not worked, or $1,805.85 for the second work year. During the period from October 24, 1940, to November 27, 1941, inclusive, a period of 400 days, the plaintiff should have been paid at the rate of 30¢ per hour for the first 40 hours in each week and at the rate of 45¢ per hour for 51 hours of overtime in each week, which amounts in a period of 57 weeks and one day (400 days) to $1,992.15 for the weeks and $3.90 for the extra day, or $1,996.05. The total wages earned by the plaintiff during the period of his employment since the effective date of the Act, therefore, amount to $5,290.14. He was paid at the rate of $75 per month for a period of thirty-seven (37) months, or $2,775, leaving a balance due him of $2,515.14. He is entitled to a like amount as liquidated damages, and the sum of Five Hundred ($500) Dollars is awarded to him as a reasonable attorney fee.

The complaint properly alleges the number of hours worked and the rate of pay, but claims $4,859.50 for wages because of errors in computation. The complaint is amended at plaintiff's request so as to claim $5,030.28 for wages, and judgment may be entered for the plaintiff for the sum of $5,530.28 damages, with costs to the plaintiff.